Molly **McCLELLAN**, Charles Mitchell, Marilyn Ferrari, Al Ferrari, Marie Carney, Patricia Farmer, Mary Blue, Anita Gail, Jackie Ragno, Jack Hawkins, and Craig Eley, Plaintiffs–Petitioners,

v.

Natalie **MEYER**, Secretary of State for the State of Colorado, and Protestor/Opponent George Dibble, Defendants–Respondents.

No. 94SA282.

Supreme Court of Colorado,
En Banc.

June 26, 1995.

---

26

Dallas, Holland & O'Toole, P.C., Neil D. O'Toole, Denver, for plaintiffs-petitioners.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., Gen. Legal Services Section, Denver, for defendant-respondent Natalie Meyer, Secretary of State for the State of Colo.

Mark Bender, Denver, for defendant-respondent George Dibble.

Justice VOLLACK delivered the Opinion of the Court.

This appeal requires a determination of whether a petition filed with the office of the appellee, Colorado Secretary of State Natalie Meyer (the Secretary), contained a sufficient number of valid signatures to place the initiative entitled the "Safe Workplace Amendment" on the ballot. The Denver District Court upheld the initial decision of the Administrative Law Judge and the final administrative decision of the Secretary. The appellants, the proponents of the initiative, appealed the district court's judgment directly to this court pursuant to section 1–40–119, 1B C.R.S. (1994 Supp.), and we accepted this appeal.

We affirm the district court's ruling.

## I.

The appellants circulated, signed, and proposed an amendment, the "Safe Workplace Amendment", to Article II of the Colorado Constitution. The amendment provides:

Anyone who, in the course of business, knowingly maintains an unsafe work environment shall not be immune from suit for a resulting injury or death by a worker and his survivors for any and all damages.

On January 10, 1992, the appellants filed their proposed initiative with the Legislative Council and the Office of Legislative Legal Services for review and comment, pursuant to section 1–40–101, 1B C.R.S. (1992 Supp.).[1] On February 24, 1992, the Initiative Title Setting Board met and established the title, submission clause, and summary pursuant to section 1–40–101(2), 1B C.R.S. (1992 Supp.).[2]

On August 3, 1992, the final version of the initiative was filed with the Secretary. By statutory mandate, the Secretary was given twenty-one days to review the petition. The Secretary hired temporary personnel, who were trained and supervised by the Secretary's staff, to review signatures and perform data entry.[3] The temporary personnel were provided a manual drafted by the Secretary's staff which contained instructions on the grounds for accepting and rejecting signatures. Using a master voting list as of July 17, 1992, they determined which signers were registered voters.[4] They then entered this information into the Secretary's computer.[5]

On August 24, 1992, after an examination of the petition, the Secretary issued a decision declaring that the petition did not contain the requisite number of valid signatures in order for the initiative to appear on the 1992 ballot since an additional 6,729 signatures were needed to satisfy the minimum number of valid signatures.[6] The appellants

---

1. Article 40, entitled "Initiative and Referendum," was amended in 1993, resulting in the relocation of provisions. Because the amended article states that it shall apply only to any offense committed on or after May 4, 1993, and to any measure pending on such date that was proposed on or after the 1992 general election, we refer to the statutes which were in effect during the events of this case throughout this opinion.

2. An appeal of the title was filed with this court. See Matter of Proposed Initiated Amendment Concerning Unsafe Workplace Environment, 830 P.2d 1031 (Colo.1992). The appellants did not receive effective formal approval of the petition format from the Secretary until June 12, 1992.

3. The testimony at the administrative hearing established that the Secretary hired these temporary employees because of the large number of petitions, containing over 500,000 signatures, filed on or about August 3, 1992.

4. The operators were also instructed to ask a supervisor to review any questionable signatures.

5. Under § 1–40–109(1)(b)(I), 1B C.R.S. (1992 Supp.), the Secretary is required to identify insufficient signatures, by petition section number and line number, and the grounds for insufficiency. From this evaluation two computer lists are generated: the "accept" list and the "reject" list of signatures.

6. The Colorado Constitution provides:

The first power hereby reserved by the people is the initiative, and signatures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election shall be required to proposed any measure by petition. . . .

Colo. Const. art. V, § 1(2) (1994 Supp.). The parties agree that 49,279 valid signatures were necessary to satisfy the constitutional formula and place the proposed initiative on the 1992 ballot.

submitted 71,044 total signatures and 28,494 were deemed invalid. The Secretary disallowed signatures, primarily on the following grounds: rejecting signatures by circulators and petition signers who were deemed not to be registered electors because the residence addresses listed on the petition, in failing to provide detailed information, differed from the residence addresses set forth on a master voting list maintained by the Secretary; declaring unacceptable the petitions to which were affixed circulator affidavits signed on dates different from the dates appearing on the corresponding notarization statements; rejecting petition signatures based on the fact that the circulators were not registered electors; and disqualifying 4,535 registered electors because these signatures were obtained prior to June 12, 1992, the date on which the Secretary approved the petition format, and the date that the Secretary considered to be the earliest acceptable date to obtain signatures.[7]

The appellants filed timely protests to the Secretary's decision pursuant to section 1-40-109(1)(c), 1B C.R.S. (1992 Supp.), contesting that the initiative had an insufficient number of signatures which required its disqualification from the 1992 election ballot. The case was assigned to an administrative law judge (the ALJ) for a hearing on the merits which lasted nine days. On February 16, 1993, the ALJ issued her decision upholding the Secretary's ruling that the appellants had failed to obtain a sufficient number of signatures to allow the petition to be placed on the ballot.[8]

The appellants filed timely exceptions to the ALJ's initial decision on March 15, 1993. The Secretary thereafter issued a final decision, affirming the ALJ's initial decision and concluding that the proposed constitutional amendment should not be placed on the November 1993 ballot.

The proponents thereafter filed a complaint in the Denver District Court seeking judicial review of the Secretary's final decision. The district court, in its May 26, 1994 written order, entered a judgment affirming the Secretary's final decision, denying the initiative's placement on the 1993 ballot, and adopting the ALJ's analysis in its entirety. The district court found that, although the Secretary erred in rejecting all of the appellants' exceptions as lacking particularity and in applying the perfect match rule to its extreme, the petition did not contain a sufficient number of signatures.

The appellants thereafter appealed the district court's judgment directly to this court pursuant to section 1-40-119, 1B C.R.S. (1994 Supp.). In its opening brief before this court, the appellants request consideration of six issues. Our review of the propriety of the Secretary's conduct is limited to the following six issues:[9]

> Whether the Secretary of State's use of temporary personnel violated the Colorado Constitution Art. XII, Section 13(9).

> Whether the Secretary of State erred in failing to issue a statement of sufficiency in violation of § 1-40-109, 1B C.R.S. (1992 Supp.).

> Whether the Secretary of State erroneously employed restrictions not found in §§ 1-40-106 or 1-40-109, 1B C.R.S. (1992 Supp.), when using a "perfect match" methodology developed without a ruling making public the hearing.

7. The ALJ determined that the signatures rejected by the Secretary because they were obtained prior to June 12, 1992, should be restored as qualified electors.

8. The ALJ concluded, nevertheless, that the appellants established that an approximately 7,700 additional valid petition signatures were filed with the Secretary in support of the Safe Workplace Amendment, increasing the number of valid signatures to approximately 50,250.

9. The appellants' brief also contains conclusionary statements in which they maintain that their First Amendment political free speech rights were thwarted by the Secretary's denial of the petition signatures.

Neither the Secretary nor the appellee, George Dibble, one of the protestor-opponents, has considered any First Amendment issues in their corresponding briefs. Our review of the issues articulated in the appellants' petition for review filed in the district court and in their brief filed before us reveals that this issue is not properly before us on this appeal. *See Committee For Better Health Care v. Meyer*, 830 P.2d 884 (Colo. 1992).

Whether the Secretary of State improperly used July 17, 1992, master voter list to disqualify signatures.

Whether the Secretary of State erroneously applied a "perfect match" rule to disqualify.

Whether the Secretary of State disqualified all signatures on petitions circulated by non-registered voters.

## II.

In reviewing a district court's analysis of an agency's action, we are guided by the standard of review set forth in section 24–4–106, 10A C.R.S. (1988), which states in pertinent part as follows:

> If [the court] finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action and shall restrain the enforcement of the order or rule under review, compel any agency action to be taken which has been unlawfully withheld or unduly delayed, remand the case for further proceedings, and afford such other relief as may be appropriate.

§ 24–4–106(7), 10A C.R.S. (1988).

■ A reviewing court may reverse an administrative determination only if the court finds that the agency exceeded its constitutional or statutory authority, made an erroneous interpretation of law, acted in an arbitrary and capricious manner, or made a determination that is unsupported by the evidence in the record. *Id.* Based on this standard, we may determine that an agency's action is either arbitrary or capricious, violative of constitutional rights, or constitutes an abuse of discretion.

## III.

■ The appellants first assert that the Secretary violated Article XII, Section 13(9), of the Colorado Constitution by hiring the temporary personnel to assist in the examination of petition signatures and to perform data entry functions which exceeded the scope of the Secretary's authority. The Secretary maintains that the temporary employees were hired to assist with the petition process because she was inundated with an unusually large number of petitions to review within the twenty-one day period.

The district court considered this to be a nonmeritorious issue and stated as follows:

> [T]here is absolutely nothing in §§ 1–40–101 *et seq.*, in the state personnel code, in the Administrative Procedures Act, or in any case law Plaintiffs have presented, which suggests or even hints that an aggrieved party's right to object to final agency action somehow encompasses a general right to inquire into the lawfulness of the agency's hiring practices. The issue here revolves around the Secretary's Final Order, not her staffing decisions. The Final Order is either erroneous or not erroneous, and that analysis is wholly unrelated to whether the Final Order was the product of ten overworked permanent employees, or 10,000 underworked and unlawfully employed temporary employees.

Article XII, Section 13(9), of the Colorado Constitution provides:

> The state personnel director may authorize the temporary employment of persons, not to exceed six months, during which time an eligible list shall be provided for permanent positions. No other temporary or emergency employment shall be permitted under the personnel system.

Section 24–50–114, 10B C.R.S. (1994 Supp.), provides:

> **Temporary appointments—term—tenure.** ... (2) The state personnel director may, by rule, authorize principal department heads ... to employ persons from outside the state personnel system on a temporary basis while an eligible list is being provided or in emergency or season-

able situations nonpermanent in nature, but in each case the period of employment shall not exceed six months.

In construing statutory provisions, our responsibility is to give full meaning to the legislative intent. *Conte v. Meyer,* 882 P.2d 962 (Colo.1994). It is presumed that the General Assembly intends a just and reasonable result when it enacts a statute, and a construction which leads to an absurd result will not be followed. *City of Ouray v. Olin,* 761 P.2d 784, 788 (Colo.1988).

The Secretary is responsible for supervising the initiative process and is charged with the duty of ensuring that a sufficient number of registered electors have complied with the initiative requirements before allowing the initiative to be placed on the ballot. *Adams v. Hill,* 780 P.2d 55 (Colo. App.1989). The legislative intent and purpose of section 24–50–114(2) is clear: the statute permits the Secretary to hire temporary personnel to perform clerical tasks when the situation is an emergency or seasonable and is nonpermanent in nature.

The operators were instructed that, in reviewing a name, the name on the computer-generated list controlled. If the operator was unable to read the printed name on the petition, the supervisor was to review the signature. When the signature matched the name on the computer list, the policy was to accept it.

Before issuing her final agency order, the Secretary, based upon the evidence presented by the appellants and the opponents of the initiative, concluded that the petition did not contain the minimum number of required signatures. The Secretary's decision was separate and distinct from the conclusions made by the temporary employees. Further, at the administrative hearing to review the Secretary's initial decision, the appellants had a full and fair opportunity to contest each signature rejected by the Secretary. The ALJ affirmed the Secretary's initial decision.

We do not believe that the General Assembly intended to exclude from the statute's coverage the Secretary's ability to review petitions within the given deadline. Because the Secretary hired these workers to examine a large number of petitions during a twenty-one day period in which she was inundated with petitions for review, we conclude that her actions did not violate the Colorado Constitution.

## IV.

Appellants further maintain that the Secretary, in her final decision, did not comply with the statutory requirements of section 1–40–109(1)(b)(II), 1B C.R.S. (1992 Supp.), because she failed to inform them of the number of insufficient signatures and the exact grounds for insufficiency.

Under section 1–40–109, 1B C.R.S. (1992 Supp.), the Secretary initially reviews the signatures on the petition upon submission by the proponents. The Secretary must assure that the information was written by the person making the signature, that no signatures have been added after the affidavit has been executed, and that the signer is a registered elector. After this review, the Secretary must issue a statement of sufficiency which declares whether the petition contains the requisite number of signatures to obtain a place on the ballot. If the Secretary determines that the petition does not have the minimum number of signatures, then the Secretary must identify, by section number and line number, those signatures found to be insufficient and the grounds for such insufficiency. § 1–40–109(1)(b)(II), 1B C.R.S. (1992 Supp.).

The second level of review is an administrative hearing. §§ 1–40–109(2)(a), 1B C.R.S. (1992 Supp.). The ALJ issues an initial decision which includes a statement of findings and conclusions upon all the material issues of fact, law, or discretion presented, and informs the parties of the grounds for the decision. § 24–4–105(14)(a), 10A C.R.S. (1994 Supp.). The third level of review of the sufficiency of the petition is performed by the district court for the county in which such petition is filed, and that determination may ultimately be reviewed by this court. § 1–40–109(2)(a), –(3), 1B C.R.S. (1992 Supp.).

The district court rejected the appellants' argument that the Secretary's final agency order was insufficient because it did not specify the number of petition signatures disqualified. The district court reasoned as follows:

[T]here is no statutory requirement that the Secretary at the final agency action stage, or for that matter the ALJ at the initial decision stage, make specific numerical findings. Instead, that requirement is directed to the Secretary's initial statement regarding disallowance made immediately after the signature count. § 1-40-109(1)(b)(II). That statement here contains specific numerical findings: 28,494 of 71,044 signatures were disallowed.

Where, as here, the ALJ and later the Secretary affirm and reverse parts of that initial disallowance, but do so in a manner from which it can be determined whether the minimum number of allowed signatures had or had not been gathered, it is no more necessary for them to reduce their conclusions to a final number of allowed and disallowed signatures than it is for me to do so in this Order.

We agree with the reasoning of the district court. Although section 1-40-109 requires the Secretary to review the ALJ's decision, we conclude that the Secretary, in her final decision, was not required to repeat the list of signatures disqualified and the reasons for disqualification.

### V.

■ Appellants next maintain that the perfect match rule used by the Secretary to disqualify signatures based upon slight differences in the names and addresses appearing on the petition and the names and addresses on the master list failed to comply with the requirements found in sections 1-40-106(2)(a), and 1-40-109(1)(b)(I), 1B C.R.S. (1992 Supp.). Specifically, the appellants maintain that the Secretary erroneously rejected signatures when there was a discrepancy between the street directional or apartment number which appeared on the petition and the street directional or apartment number which appeared on the master voting list. Further, the appellants argue that the Secre-

tary erred in failing to take judicial notice of persons whose city of residence changed by virtue of town annexations, which resulted in the disqualification of numerous registered voters who were eligible to sign a petition, but who had filled out the petition form using their city's name prior to annexation.

Section 1-40-106(2)(a), 1B C.R.S. (1992 Supp.), provides in pertinent part:

Any initiative or referendum petition shall be signed only by registered electors. Each registered elector shall sign his own signature and shall print his name, the address at which he resides, including the street number and name, the city and town, the county, and the date of signing.

Section 1-40-109(1)(b)(I), 1B C.R.S. (1992 Supp.), provides:

Upon submission of the petition, the secretary of state shall examine each name signature on the petition.... The secretary shall assure that the information required by section 1-40-106 is complete, that the information on each signature line was written by the person making the signature, that no signatures have been added to any sections of the petition after the affidavit required by section 1-40-106(2)(b) has been executed, and that such person is a registered elector. A person shall be deemed a registered elector if his name and address appear on the master voting list kept by the secretary of state at the time of signing the section of the petition. The secretary of state shall not count the signature of any person who is not a registered elector or whose information is not complete....

The ALJ determined that a perfect match is not required when reviewing signatures in the initiative and the master voting list. Specifically, the ALJ stated:

[Section 1-40-106(2)(a) ] requires the signer to provide an address which includes the street number and name, the city and town, and the county. There is no requirement that an apartment number or street directional be given. It is clearly within the intention of this statute for the signers to provide sufficient information for the Secretary to make a comparison with the

master voting list in order to determine whether a person is a registered voter. Thus, where the master voting list shows a street address without an apartment number and the signer gives an apartment number on the petition, this number merely constitutes extraneous information and should not disqualify the signer. If the master voting list does indicate an apartment number and the signer has not shown that number on the petition, likewise, the signature should not be excluded because the statute does not require that information. The Secretary argues that it is possible that a person has moved within a building and therefore is living at a different registered address. However, where the person has complied with providing the information required under Section 1–40–106, the signature should be counted. A similar approach would require that if the master voting list did not indicate a directional and the petition did indicate one, the signature would be accepted, with the reverse also being true.

The ALJ additionally rejected the appellants' request to take judicial notice of all annexations within the state except where the Secretary had actual knowledge that, through annexation, a town's name had changed. For example, the ALJ discussed the situation of the city of Security which was created from unincorporated Colorado Springs. The ALJ concluded that, based upon the Secretary's knowledge of this annexation, the Secretary should have accepted petition signatures when the city of Security appeared on the petition and the city of Colorado Springs appeared on the master voting list. The ALJ found that no other convincing evidence was provided as to any specific signatures affected by any other annexations.

The district court affirmed the ALJ's determination and concluded that the Secretary erred in her adoption and application of the perfect match rule which resulted in the disallowance of many valid signatures.

The district court reviewed several situations in which the Secretary erroneously applied the perfect match rule:

[T]he Secretary disallowed signatures of people who listed their address on the petition as being in the town of Security, Colorado, where the voting list showed the identical names and addresses but showed their residency in Colorado Springs, Colorado. It is undisputed that in the interim the town of Security had become incorporated as a municipality separate and apart from Colorado Springs.

... [T]he Secretary rejected signatures where the signator included on the petition all the information required by § 1–40–106(2)(a), where that information matched perfectly the information in the voter list, but where the signator gave extraneous information not contained in the voter list (e.g. an apartment number or a street directional).

Although there is undoubtedly considerable administrative merit to the perfect match rule, I agree with [the ALJ] that to apply that rule in the wooden manner suggested by the Secretary would not only be nonsensical and unjust in some abstract sense, but more importantly would unduly interfere with Colorado citizen's constitutionally protected right to petition. Colo. Const. art. V, § 1.

In *Committee for Better Health Care v. Meyer*, 830 P.2d 884, (Colo.1992), the perfect match issue involved a situation in which a signer gave an address on the petition entirely different from the address in the voter list. We approved the Secretary's administrative policy of disallowing such signatures, since in such a circumstance "it is reasonable to conclude that the sign[er] has abandoned the latter [voting list] address and therefore is no longer a registered elector." *Id.* at 900.

█ The primary justification for requiring a petition signer to provide information with respect to identity and residence is to safeguard the integrity of the petition process by allowing the Secretary to initially determine whether a particular petition signer is a qualified registered elector and to permit anyone interested in protesting the petition likewise to confirm or disprove the voting eligibility of the petition signer. *Clark v. City of Aurora*, 782 P.2d 771, 782 (Colo.1989).

In *Clark*, we addressed a municipal ordinance which required an elector who signed a referendum petition, *inter alia*, to include a house or apartment number in addition to a street name, and designations such as north or south or street or avenue. In analyzing the relevant sections of the Aurora City Code, we acknowledged that

> there may be certain circumstances in which a wooden application of section 14–13(a)[ (4) ] [ ("[a]n incomplete address being given by an individual (i.e.), omitted designation of street, avenue, drive, court, place, way, east, west, etc.") ] might unduly impair an individual's right of referendum. For example, if a petition signer resides within a municipality at "955 Elm Street" and designates his address on the petition as "955 Elm," and Elm Street is the only public way within the municipality with the designation of "Elm," then it would appear that the designation of "955 Elm," although technically not in total compliance with the letter of the Aurora ordinances, would nonetheless provide the city clerk and any other interested person with sufficient information to determine whether the designated address is within the city and also to determine whether the signer actually lives at that address.

*Id.* at 781.

In contrast, here, the Secretary invalidated petition signatures based upon the inclusion or exclusion of a street directional or apartment number from either the petition or master voting list, where the signer otherwise provided the necessary information with respect to the signer's address as required by the statute. We therefore agree with the district court that the information provided by the petition signatures concerning their residence was sufficient to safeguard the integrity of the petition process. Accordingly, we conclude that the Secretary erred in its adoption and application of the perfect match rule which resulted in the disqualification of registered electors who were otherwise qualified.

---

10. The district court, in its order, did not address

## VI.

The appellants also argue that the Secretary improperly used the July 17, 1992, master voter list to disqualify petition signatures.

At the administrative hearing, the appellants argued that certain names should be counted because they were registered electors at the time that they signed the petition. The ALJ agreed, and the Secretary, in her final decision, affirmed the ALJ's decision.[10] The ALJ, however, upheld the Secretary's ruling that the appellants had failed to obtain a sufficient number of signatures to allow the petition to be placed on the ballot.

Because both the ALJ, in her decision, and the Secretary, in her final decision, concluded that certain names should have been counted as valid signatures, this argument becomes a non-issue for purposes of this appeal.

## VII.

Further, according to the appellants, the Secretary erred in invalidating signatures where the designation of junior or senior was omitted from either the petition or the master list, where post office boxes were used in lieu of residential addresses, and where the date on which the circulator signed the petition did not match the date on which the notary executed the petition.

The ALJ affirmed the Secretary's initial decision, rejecting signatures where the signer indicated a designation of junior or senior which was omitted from either the petition or the master list. The ALJ additionally found that, when an elector moves to a new residence and retains the same post office box as a mailing address, a comparison of the master voting list and the petition does not enable the Secretary to verify that elector's status and therefore the petition must be rejected. The ALJ did, however, recognize a limited exception, that being where a post office address is shown in the master voting list as being the only address assigned to a residence. Accordingly, the ALJ concluded that when a post office address serves as a mailing address but the

---

this issue.

voter has a separate and distinct residence address, then the petition should be rejected. But when it is shown that an individual is registered at a post office address which is the only address assigned to that residence, the ALJ concluded that a signature reflecting this address will be accepted. We agree with the ALJ's reasoning.

The ALJ also determined that the date of the elector's signature is necessary to determine whether the signer signed prior to the circulator's affidavit date and whether the signer was a registered elector at the time. The ALJ found that the testimony and affidavits of the circulators established that they signed the circulator affidavits in the presence of a notary and no contravening evidence was presented to dispute this finding. Accordingly, the ALJ concluded that approximately 131 of the signatures initially rejected should have been accepted.[11]

The relevant constitutional and statutory provisions implicitly require the establishment of safeguards to prevent fraud and corruption in securing a petition.[12] It is essential that the petition disclose information which will readily permit the Secretary to examine the petition and determine if the signers are qualified. Based on this genuine concern for upholding the integrity of the petition process, we hold that the Secretary properly rejected signatures when the signer indicated a designation of junior or senior which was omitted from either the petition or the master list. Such a designation suggests that another person possesses that name and therefore the Secretary was correct in requiring a match between the petition and master voter list in order to confirm that designation. Similarly, as the ALJ determined, because a post office address and a residence are not always the same, we refuse to assume or infer that they are unless the master voting list reveals that a post office address is the only address assigned to a particular residence.

In *Committee for Better Health Care,* 830 P.2d 884 (Colo.1992), we were also presented with date discrepancies between circulator affidavits and the date of notarization. We stated as follows:

> The affirmation form appearing on circulator affidavits requires that the document be subscribed and sworn to personally by the circulator in the presence of a notary public on a date certain. Correspondence of the dates on a circulator affidavit and on the prescribed affirmation form provides a strong basis for the conclusion that a signature purporting to be that of a circulator is in fact that circulator's signature and that the circulator in fact witnessed the petitioners' execution of the corresponding petition. Conversely, a discrepancy in those two dates establishes that the circulator did not sign the circulator affidavit in the presence of the notary, thus presenting an irregularity in the initiative process. Such irregularity would in most circumstances amply justify initial administrative rejection of the petition in question. The availability of a procedural mechanism permitting proponents to introduce evidence to establish the validity of such signatures is sufficient to assure that the right to the initiative is not unduly burdened by such administrative policy.

*Id.* at 898 (citations omitted).

At the administrative hearing, the ALJ determined that the circulators had signed the affidavits in the presence of a notary. The ALJ concluded that the notarization was valid and reversed the Secretary's rejection of the petitions associated with the affidavits.

It is the function of the Secretary and the ALJ, not the reviewing court, to weigh the evidence and determine the credibility of the witnesses. *See Board of Assessment Appeals v. Colorado Arlberg Club,* 762 P.2d 146, 151 (Colo.1988). In the absence of other evidence suggesting that the affidavits were invalid, we conclude that the ALJ's decision is supported by the evidence and is neither arbitrary nor capricious.

---

11. The district court did not directly address these miscellaneous arguments;˙ rather, it affirmed the Secretary's final agency order which upheld the ALJ's determination.

12. *See* §§ 1–40–106(2)(a), (b), 1–40–109(1)(b)(I), 1B C.R.S. (1992 Supp.); Colo. Const. art. V. § 1(6) (1994 Supp.).

## VIII.

■ Finally, the appellants aver that the district court erred in upholding the Secretary's decision which disqualified all petitions circulated by non-registered voters.

■ The ALJ determined that, because the Secretary was initially obligated by a federal temporary injunction to accept circulator affidavits from non-registered electors, the Secretary's compliance with that order was proper.[13] The ALJ affirmed the Secretary's determination that once the federal injunction had been vacated, those petitions circulated by persons who were not registered electors were invalid.[14]

The district court affirmed the ALJ's ruling and concluded that the Secretary was obligated by the Colorado Constitution to disallow petitions circulated by nonregistered voters. We agree with the district court's ruling on this issue.

Article V, Section 1(6), of the Colorado Constitution requires persons signing initiatives to be registered electors. This section provides in pertinent part:

> To each of such petitions ... shall be attached an affidavit of some registered elector that each signature thereon is the signature of the person whose name it purports to be and that, to the best of the knowledge and belief of the affiant, each of the persons signing said petition was, at the time of signing, a registered elector. Such petition so verified shall be prima facie evidence that the signatures thereon

are genuine and true and that the persons signing the same are registered electors.

Colo. Const. art. V, § 1(6) (1994 Supp.).

Further, section 1–40–106(2)(b), 1B C.R.S. (1992 Supp.), provides:

> To each petition section shall be attached a signed, notarized, and dated affidavit executed by the *registered elector* who circulated said petition section, which shall include his printed name, the address at which he resides, including the street name and number, the city or town, and the county, the date he signed the affidavit; that he was a registered elector at the time the section of the petition was circulated and signed by the listed electors; that he circulated the said section of the petition; that each signature thereon was affixed in his presence; that each signature thereon is the signature of the person whose name it purports to be; that to the best of his knowledge and belief each of the persons signing said petition section was, at the time of signing, a registered elector.... The secretary of state shall not accept for filing any section of a petition which does not have attached thereto the notarized affidavit required by this section.

(Emphasis added.)

Both the Colorado Constitution and section 1–40–106(2)(b) require that all circulators of initiative petitions be registered electors and must attach a prescribed affidavit to each petition they circulate together with their printed name, residence address, including the street number and name, city or town,

---

13. In *American Constitutional Law Foundation Inc. v. Meyer*, Case No. 92–N–69 (D.Colo. Jan. 1992), the district court prohibited the Secretary from enforcing this provision concerning registered elector status of circulators. This case was thereafter dismissed for lack of prosecution and the preliminary injunction was vacated.

14. The appellants assert that the Secretary erred in giving "ex post facto" effect to the federal district court's order vacating the preliminary injunction. We do not find this argument persuasive.

The Colorado Constitution provides that "[n]o ex post facto law, nor law ... retrospective in its operation ... shall be passed by the general assembly." Colo. Const. art. II, § 11. A statute violates this constitutional prohibition if it

" 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already [past].' " *Committee for Better Health Care*, 830 P.2d at 891 (quoting *Moore v. Chalmers–Galloway Live–Stock Co.*, 90 Colo. 548, 554, 10 P.2d 950, 952 (1932)).

Here, the federal injunction operated as a procedural remedy to preserve the status quo until a final hearing and a determination was made as to the controverted rights of the parties in the federal action. Application of the federal injunction to the initiative process did not constitute retroactive application of legislation or statutes, which is the harm that Article II, § 11, of the Colorado Constitution was intended to prevent.

the county and the date the affidavit was signed.

The Secretary was enjoined from enforcing this constitutional provision, that circulators must be registered electors, because of a preliminary injunction entered in a federal action. This injunction was effective at the time the petitions were circulated, and the Secretary issued a policy statement which stated that the Secretary would not be checking the registered status of circulators. This injunction was vacated in February 1993, and the Secretary had the obligation to enforce the law as if the injunction had never been entered. The Secretary thereafter rejected all petition sections circulated by non-registered circulators at the time of circulation.

Once the preliminary injunction had been lifted, the Secretary was obligated by the Colorado Constitution to disallow petitions circulated by nonregistered voters. Accordingly, when the Secretary issued her final agency order in August 1993, she was under this obligation and her actions were appropriate.

## IX.

In conclusion, we affirm the district court's order and hold that the district court did not err in finding and concluding that the ALJ's decision was neither arbitrary nor capricious but supported by competent evidence.

MULLARKEY, J., concurs in part and dissents in part.

Justice MULLARKEY concurring in part and dissenting in part:

In this case, the majority affirms the district court's ruling upholding the Secretary of State's (the Secretary) final decision that the petitioners had not collected a sufficient number of valid signatures to place their proposed constitutional amendment on the November 1993 ballot. I concur with the majority except as it upholds the Secretary's decision to invalidate signatures where the designation of "junior" or "senior" was omitted from either the petition or the master voter registration list. Maj. op. at 33.

In a recent opinion addressing the sufficiency of an initiative petition under Colorado's constitutional and statutory provisions governing the exercise of the right of initiative and referendum, *Loonan v. Woodley*, 882 P.2d 1380 (Colo.1994), we held that "substantial compliance" is the appropriate standard to apply. We stated:

> The right of initiative and referendum, like the right to vote, is a fundamental right under the Colorado Constitution. *See Clark v. City of Aurora*, 782 P.2d 771, 777 (Colo.1989) (right of initiative); *Meyer v. Lamm*, 846 P.2d 862 (Colo.1993) (right to vote).... In light of the nature and seriousness of these rights, we have held that constitutional and statutory provisions governing the initiative process should be "liberally construed" so that "the constitutional right reserved to the people 'may be facilitated and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right.'" *Montero v. Meyer*, 795 P.2d 242 (Colo.1990) (citations omitted).... [W]e now hold that substantial compliance is the appropriate standard to apply in the context of the right to initiative and referendum.

*Loonan*, 882 P.2d at 1383–84.

Under this standard, the omission of "senior" or "junior" from either the signature on an initiative petition or the master voter registration list should not automatically invalidate the signature. The majority has rejected the perfect match requirement with respect to street directional designations and, in my view, the perfect match requirement should be rejected in the senior/junior context as well. Unless the master voter list shows both senior and junior persons of the same name at the same address, there can be no confusion and no possible fraud. Requiring the senior/junior designation in the absence of such evidence elevates a mere technical defect to the level of substance and should not be used to restrict the right of initiative. *Cf. Loveland v. Sears*, 1 Colo. 433, 435 (1872) (omitting the word "junior" from plaintiff's name in the judgment was immate-

rial since "junior" is "no part of a name" and recitation in the judgment made clear that the judgment was rendered in plaintiff's favor). Accordingly, I would hold that the Secretary improperly rejected signatures where the designation "senior" or "junior" had been omitted from either the petition or the master list.